## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COUNTRY STONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 14-81854 |
| | ) | (Request for Joint Administration |
| | ) | Pending) |
| Debtors. | ) | |
| | ) | |
| | ) | Hon. Thomas L. Perkins |

### DECLARATION OF STEVEN NERGER IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Steven Nerger, hereby declare under penalty of perjury,

1.      I am the Chief Restructuring Officer for each of the above-captioned debtors and debtors in possession (collectively, the "Debtors").[2]  I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2.      On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (collectively, these "Chapter 11 Cases").

3.      The Debtors are operating their business and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has

---

[1]  The Debtors and the last four digits of the Debtors' United States Tax Identification Number following in parentheses are: Country Stone Holdings, Inc. (7470), Country Stone & Soil, Inc. (0842), Country Stone and Soil of Minnesota (8538), Country Stone and Soil of Wisconsin (4446), Country Stone, Inc. (8953), Fort Wayne Landscape Supply, Inc. (9116), Green Thumb of Indiana, LLC (8377), Infinity Fertilizers, Inc. (8035), Infinity Lawn and Garden, Inc. (5005), Infinity Seed, Inc. (6096), Millburn Peat Company (7370), Quad City Express, Inc. (2687), R & D Concrete of Indiana, Inc. (5210), R & D Concrete of Wisconsin, Inc. (2237), R & D Concrete Products, Inc. (7199), Rock Island Contractors, Inc. (0041) and Wilhelm Sand & Gravel, Inc. (5212).

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion (as hereinafter defined).

been made for the appointment of a trustee or examiner, and no official committee has yet been appointed by the Office of the United States Trustee.

4.      In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors have requested various types of relief in certain "first day" motions (each, a "<u>First Day Motion</u>" and collectively, the "<u>First Day Motions</u>").  The First Day Motions seek relief aimed at, among other things:  (a) securing post-petition financing necessary to continue the Debtors' operations; (b) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process; and (c) enabling the Debtors to move smoothly towards a sale of their assets.  Gaining and maintaining the support of the Debtors' customers, employees, vendors and suppliers, and certain other key constituencies, as well as maintaining the Debtors' day-to-day business operations with minimal disruption, will be critical to the success of these Chapter 11 Cases and the Debtors' reorganization efforts.

5.      I submit this declaration (the "<u>Declaration</u>") in support of the First Day Motions. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) constitutes a critical element in achieving a successful bankruptcy process; and (iii) is in the best interests of the Debtors, their estates and creditors.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, on information supplied to me by other members of the Debtors' management teams and/or professionals retained by the Debtors, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition, and present liquidity needs.  If I were called upon

to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of each Debtor.

7.      Part I of this Affidavit provides an overview of the Debtors' business operations and describes the Debtors' corporate history and prepetition capital and debt structure and the circumstances surrounding the commencement of these Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Motions.

## PART I

**A.      Current Business Operations and Capital Structure**

8.      The Debtors are in the business of manufacturing, processing, and packaging lawn and garden products such as mulch, soil, fertilizer, plant food, organics, concrete and decorative stone for sale both to "big box" retailers, as well as to smaller, independent garden supply stores.

9.      The Debtors corporate headquarters are located in Rock Island, Illinois and Milan, Illinois.  The Debtors operate 17 plants throughout the United States, including in Illinois, Iowa, Indiana, Minnesota, Wisconsin, Missouri, and California.

10.      The Debtors' principal director and senior-most officer, other than myself, is Ron Bjustrom.  Bjustrom is also a significant shareholder of Country Stone Holdings, Inc. and certain of the other Debtors.  Specifically, the Debtors' corporate structure is as follows:

- Bjustrom (who owns approximately 85%) and approximately 24 other individual shareholders own 100% of Country Stone Holdings, Inc.

- Country Stone Holdings, Inc. owns 100% of the following 13 Debtors:

  o   Country Stone & Soil. Inc.

  o   Country Stone & Soil of Minnesota, Inc.

  o   Country Stone & Soil of Wisconsin, Inc.

- o Country Stone, Inc.

- o Infinity Lawn & Garden, Inc.

- o Infinity Seed, Inc.

- o Quad City Express, Inc.

- o R&D Concrete of Indiana, Inc.

- o R&D Concrete of Wisconsin, Inc.

- o R&D Concrete Products, Inc.

- o Rock Island Contractors, Inc.

- o Wilhelm Sand & Gravel, Inc.

- o Infinity Fertilizers, Inc.

- Bjustrom owns 100% of the following two Debtors:

  - o Fort Wayne Landscape Supply, Inc.

  - o Millburn Peat Company, Inc.

- Debtor Green Thumb of Indiana, LLC is wholly-owned by a Country Stone & Soil of Indiana, Inc., which, in turn is wholly-owned by Bjustrom.

11.     The Debtors have no direct employment relationship with any party other than myself and Michael Compton, who is the Debtors' Cash and Restructuring Manager.  All other employees are provided through service agreements with a non-debtor, Consolidated Resources, Inc., another entity owned by Bjustrom.  Approximately 148 employees are made available to the Debtors through those service agreements.

**B.     Prepetition Loan Agreements**

12.     Pursuant to that certain First Amended and Restated Loan Agreement dated as of August 23, 2013, as amended, modified or supplemented (the "Pre-Petition Loan Agreement"), by and between the Debtors as borrowers and First Midwest, as pre-petition lender (the "Pre-

Petition Lender"), the Pre-Petition Lender made certain loans and financial accommodations (collectively, the "Pre-Petition Loans") to the Debtors to  fund the Debtors' business operations. As of October 22, 2014, the current outstanding amount owing by the Debtors under the Pre-Petition Loan Agreement is approximately $38,177,950.10.

13.     Bjustrom and Country Stone & Soil, Inc. (not a Debtor here) have guaranteed in full the Pre-Petition Loans.

14.     Pursuant to and in connection with the Pre-Petition Loan Agreement, the Debtors entered into certain collateral and ancillary documentation with the Pre-Petition Lender (such collateral and ancillary documentation collectively with the Pre-Petition Loan Agreement, the "Pre-Petition Credit Documents").   Pursuant to the Pre-Petition Credit Documents, the Pre-Petition Loans were secured by a substantial portion of the Debtors' assets.

15.     In addition to the Pre-Petition Loans, Debtor Country Stone & Soil of Minnesota, Inc. is a party to a loan agreement pursuant to which it received loans and other financial accommodations from Triumph Community Bank (f/k/a The National Bank).   That loan is subject to an intercreditor agreement by and among the Pre-Petition Lender, Triumph Community Bank, and Country Stone & Soil of Minnesota, Inc.

16.     On or about August 1, 2014, the Debtors, the Pre-Petition Lender, Bjustrom and Country Stone & Soil of Indiana, Inc. entered into that certain Second Amendment and Forbearance Agreement with respect to the Pre-Petition Loans (the "Forbearance Agreement"). The Pre-Petition Lender required the Forbearance Agreement because of certain defaults that existed under the Pre-Petition Loan Documents, including that the Pre-Petition Loans were in a substantial over-advance position.   The cause of the over-advance relates to the Debtors' inaccurate reporting of its inventory value on its audited financial statements.   Indeed, for as many as 5 years, the Debtors had inaccurately reported the value of their inventory.   That

inaccuracy was not revealed until approximately February 2014, when the Debtors' own personnel identified the problem.  At no point did the Debtors' outside auditing firm, Honkamp Krueger & Co., P.C. ("Honkamp"), which had audited the Debtors' financial statements for years, identify the problem.  Instead, Honkamp issued opinions that the Debtors' financial statements were accurate and fairly represented the Debtors' financial condition.  The Debtors assert that Honkamp, in the performance of its auditing duties to the Debtors, failed to comply with generally accepted auditing standards, which failure gave rise to the Debtors need to commence these Chapter 11 Cases.  The Debtors intend to pursue all rights and remedies against Honkamp available to them.

17.    Because of the over-advance and attendant defaults, the Pre-Petition Lender and the Debtors agreed, through the Forbearance Agreement, that the Debtors would hire certain professionals from Silverman Consulting, namely myself and Michael Compton, to serve as Chief Restructuring Officer and Cash and Restructuring Manager.  Upon being retained, our duties were two-fold.  First, as Chief Restructuring Officer, I took control of all financial matters of the company, including managing the Debtors' banking relationships, implementing cash management strategies, tactics, and processes, implementing short-term and long-term liquidity-generating initiatives, among other duties.  Second, Michael Compton led a process to sell substantially all of the Debtors' assets, including interfacing with prospective purchasers, marketing the assets, and negotiating sale documents and terms.  Since our retention on August 1, 2014, Mr. Compton and I have performed those duties and will continue to perform them throughout the Chapter 11 Cases, subject to this Court's approval.

C.    **The Debtors' Marketing and Sales Efforts**

18.    The Debtors, with the assistance of their advisors, actively marketed the company since late July 2014, focusing on a sale of substantially all of their assets as a going concern.

6

Even before the Petition Date, the Debtors conducted a well-orchestrated sale process targeting the company's universe of potential strategic and financial buyers in an effort to maximize the value of the Debtors' assets.

19.     The Debtors, led by Michael Compton, have aggressively pursued a potential sale of the Debtors' assets. The Debtors undertook exhaustive efforts to solicit interest in the Debtors from third parties with the potential to acquire all or a substantial portion of the assets.

20.     At the outset of this process, the Debtors determined, in consultation with their advisors and the Pre-Petition Lender, to focus its sale efforts on locating a stalking-horse bidder for substantially all of their assets.  The Debtors believe that their businesses and assets have little value if liquidated separately, and that a sale process that includes a sale of substantially all of their assets (the "Purchased Assets") as a going concern will maximize value to the estates.

21.     During the marketing process, the Debtors identified and contacted approximately 500 potential strategic and financial counterparties. Approximately 19 of these parties executed confidentiality agreements and received a confidential information memorandum providing extensive information relating to the Debtors' businesses, financial performance and projections, customers, programs, operations, facilities, management, and employee matters. Approximately 4 companies received a detailed management presentation, either in-person or by phone, and were given the opportunity to speak extensively with the Debtors and its advisors. Of these, 4 had submitted written indications of interest to acquire some or all of the Purchased Assets of the Debtors as a going concern.  One of these parties, Quikrete Holdings, Inc. ("Quikrete"), submitted a preliminary proposal, and subsequently submitted a definitive agreement.  Quikrete is a closely-held corporation that is a major player in the concrete, decorative stone, lawn, and garden market.

22.    Quikrete's offer has been the basis for extensive discussions and negotiations with the Debtors, ongoing diligence and discussions with management, and visits to the Debtors' facilities.  As a result, on October 23, 2014, Quikrete executed an Asset Purchase Agreement (the "Agreement"), pursuant to which, among other things, Quikrete will purchase, subject to higher and better bids and an order from this Court, substantially all of the Debtors' assets.  The purchase price under the Agreement consists of an initial cash payment of approximately $23,000,000, subject to an adjustment for inventory on hand at the close, plus the assumption of certain liabilities, including certain cure costs and other expenses.

23.    At this juncture, Quikrete's bid is the highest and best that the Debtors have received.  Now that the Debtors have concluded negotiations with Quikrete as the stalking-horse bidder (subject to approval by this Court), the Debtors have begun -- and plan to continue -- to focus their attention, time, and energy on bidders with continuing interest in the Debtors' assets in order to pursue the possibility that value may be maximized at an auction.

24.    Because of various factors, including the requirements for the Debtors' maintenance of its debtor-in-possession financing, and Quikrete's desire not to unnecessarily tie up capital or risk of losing other business opportunities, the Debtors have proposed to move forward with the sale process on an expedited basis and within a specified time frame. Consequently, the Debtors have determined that it is in the best interest of their estates, creditors, and other parties in interest to move forward with an expeditious sale process.  The Debtors believe that a prompt auction and sale will generate the highest return to their creditors and other stakeholders.

## PART II

25.    Concurrently with the filing of this Chapter 11 Cases, the Debtors have filed a number of First Day Motions, consisting of procedural motions and motions relating to the

Debtors' business operations.  The Debtors submit that approval of each First Day Motion is an important element of its reorganization efforts and is necessary to ensure a smooth transition into chapter 11 with minimal disruption to their operations.  I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to the Debtors' ability to achieve a successful reorganization.  Factual information with respect to each First Day Motion is provided below and in each First Day Motion.[3]

## A.    **Procedural Motions**

### (1)    Debtors' Motion For an Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing the Joint Administration of Their Chapter 11 Cases

26.    The Debtors in these Chapter 11 Cases are affiliated entities.  The Debtors request that, in light of the fact that Country Stone Holdings, Inc. and its affiliates have each filed petitions in this Court, the Court can and should jointly administer the chapter 11 cases.

27.    The joint administration of these Chapter 11 Cases will promote economical and efficient administration of the Debtors' estates.  The Debtors anticipate that numerous motions, applications, notices, and orders will relate to several of the Debtors' cases.  Joint administration of these Chapter 11 Cases will permit use of a single general docket for all of the Debtors' cases and avoid duplicative filings by the Court, the Debtors, and parties in interest.  Thus, the Debtors believe joint administration of the Debtors' estates will reduce costs and minimize the potential for confusion, which is in the best interests of the Debtors' estates, their creditors and all other parties in interest.

---

[3] All defined terms used in this Part II of this Declaration, but not otherwise defined, shall have the same meaning as set forth in the applicable First Day Motion referred to, unless otherwise so stated.

**(2)** **Debtors' Motion for An Order Extending The Time Within Which the Debtors Must File Their (i) Schedules of Assets and Liabilities, (ii) Schedule of Executory Contracts and Unexpired Leases, and (iii) Statement of Financial Affairs**

28.     The Debtors require additional time to bring their books and records up to date and to collect the data needed for the preparation and filing of the Schedules and Statements. The Debtors consists of 17 separate business entities that will file individual Schedules and Statements. Due to the complexity of the Debtors' business, the diversity of their operations and assets, and the limited staffing available to gather, process and complete the required Schedules and Statements in the limited time available prior to the commencement of this case, the Debtors do not believe the 14-day automatic extension of time provided for by Rule 1007(c) of the Bankruptcy Rules will be sufficient to permit completion of the Schedules and Statements.

29.     The Debtors further believe that the vast amount of information that must be assembled and compiled and the large amount of employee and professional hours required for the completion of the Schedules and Statements all constitute good and sufficient cause for granting the extension of time requested herein.

30.     The Debtors believe an additional 28-day extension, for a total of 42 days, from the Petition Date would be a sufficient date by which the Schedules and Statements must be filed.

**(3)** **Debtors' Motion for an Order Appointing Epiq Solutions, LLC as the Official Claims, Noticing and Balloting Agent and to Provide Other Essential Services to the Estates**

31.     The Debtors believe that the Debtors' retention of Epiq Solutions, LLC ("Epiq") as the Claims, Noticing and Balloting Agent is in the best interests of the Debtors, their estates and creditors.

32.     The Debtors estimate that there are more than 790 potential creditors and other parties in interest who require notice of various matters. Given this estimate, it would be highly

burdensome on the Court and the Clerk's Office to perform the services that Epiq will perform. To relieve the Clerk's Office of these burdens, the Debtors propose to appoint Epiq as their notice, claims and balloting agent in these Chapter 11 Cases.

33.    The Debtors believe that the retention of Epiq is necessary for the Debtors to effectively: (a) maintain the list of creditors; (b) effect the noticing that may be required in these Chapter 11 Cases; (c) process the receipt, docketing, maintenance, recordation, and transmittal of proofs of claim in these Chapter 11 Cases; and (d) facilitate the Debtors' compliance with their reporting duties.

34.    To the best of the Debtors' knowledge, information and belief, other than in connection with these Chapter 11 Cases, Epiq has no material connection with the Debtors, the United States Trustee or the other parties in interest, or their respective attorneys or accountants, except as set forth therein.

35.    To the best of the Debtors' knowledge, information and belief, Epiq represents no interest materially adverse to the Debtors or their estates in the matters for which Epiq is proposed to be retained.  The Debtors believe that Epiq is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.  I believe that employment of Epiq is in the best interest of the Debtors and their estates and creditors.  The Debtors' knowledge, information and belief regarding the matters set forth in this subsection are based on the Tuttle Declaration.

36.    The Debtors believe that compensation proposed to be paid to Epiq and the proposed indemnification provisions are fair, reasonable, and customary for these types of engagements.

**(4)    Application of the Debtors for Order Authorizing Employment and Retention of Katten Muchin Rosenman LLP as Counsel to the Debtors**

37.     The Debtors believe that their retention of Katten Muchin Rosenman LLP ("Katten") as their counsel is in the best interests of the Debtors, their estates and creditors.

38.     To the best of the Debtors' current knowledge, information, and belief, other than in connection with these chapter 11 cases, Katten has no connection with the Debtors, their creditors or any other party in interest herein, or their respective attorneys or accountants, or the United States Trustee and assistant trustees for Region 10, or any person employed in the Office of the United States Trustee for Region 10, or any of their known attorneys or accountants, except as set forth herein and in the Sieger Declaration.  From time to time, Katten may have represented certain creditors and other parties in interest, or interests adverse to such creditors or parties in interest, all as further described in the Sieger Declaration.

39.     Katten has informed the Debtors that Katten will conduct periodic reviews of its files and promptly supplement its disclosures to the Court in the event the circumstances change or new information is discovered from that presented in the Sieger Declaration.

40.     To the best of the Debtors' knowledge, information, and belief, Katten does not represent and does not hold any interest adverse to the Debtors or their estate, creditors, equity or security holders in the matters for which Katten is proposed to be retained.

41.     Katten informed the Debtors that in the past it has represented, currently represents, and may in the future represent First Midwest Bank on matters unrelated to the Debtors, primarily in connection with the documentation of new loans.

42.     When I contacted John P. Sieger from Katten regarding Katten's representation of the Debtors on this matter, he informed me that he had been contacted by John Littrell of First Midwest Bank, who inquired whether Katten was available to represent First Midwest Bank in these matters.  However, First Midwest Bank never engaged Katten and, soon thereafter, instead retained another law firm as its counsel.

6.      The Debtors acknowledge Katten's relationships and discussions with First Midwest Bank and signed a waiver agreement allowing Katten to represent First Midwest Bank in unrelated matters.

7.      The Debtors believe that compensation proposed to be paid to Katten is fair, reasonable, and customary for these types of engagements.

**B.      Motions Relating to Business Operations**

**(1)      Debtors' Motion For Entry Of Interim And Final Orders Authorizing Debtors To (I) Obtain Post-Petition Financing Pursuant To Section 364 Of The Bankruptcy Code, (II) Provide Adequate Protection, (III) Grant Liens, Security Interests And Superpriority Claims To The Post-Petition Lender, (IV) Enter Into Debtor-In-Possession Loan And Security Agreement, And (V) Granting Related Relief**

43.      Pursuant to the Pre-Petition Loan Agreement (discussed above), the Pre-Petition Lender was granted security interests in and continuing liens on substantially all Pre-Petition Collateral.

44.      All of the Debtors' cash, including, without limitation, all cash and other amounts on deposit or maintained in the Debtors' primary deposit accounts and any amounts generated by collection of the Debtors' accounts receivable, the sale of the Debtors' inventory, or any other disposition of the Pre-Petition Collateral constitutes proceeds of the Pre-Petition Collateral and Cash Collateral.

45.      Beginning in August 2014, the Debtors, along with the assistance of their professionals with Silverman Consulting, assessed their financing needs.  The Debtors and their professionals contacted various financial institutions to request financing.

46.      The working capital facility of the type and magnitude needed in these cases could not have been obtained on an unsecured basis.  Potential sources of debtor-in-possession financing for the Debtors, obtainable on an expedited basis and on reasonable terms, were practically nonexistent.

47.     Because substantially all of the Debtors' assets are pledged to the Pre-Petition Lender, and because the Pre-Petition Lender appears to be undersecured,  the Debtors' attempts to obtain unsecured credit or credit secured by a junior lien on their assets, were unavailing. Because of the Debtors' need for the liquidity, the Debtors have concluded that, in their business judgment, the Pre-Petition Lender, who was already intimately familiar with the Debtors' business operations, corporate structure, financing arrangements and collateral base, is the only lender able to offer a post-petition credit facility to meet the Debtors' working capital needs on the terms, and within the time frame, that the Debtors require.

48.     The Pre-Petition Lender has indicated a willingness to provide the Debtors with certain financing commitments but solely on the terms and conditions set forth in the Interim Order and the Post-Petition Financing Agreement.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the Pre-Petition Lender pursuant to the terms of the Interim Order and the Post-Petition Financing Agreement represents the best post-petition financing presently available to the Debtors.

49.     The delays, cost and expense of placing this loan with a new lender, assuming one could be found, would be detrimental to the estates and ultimately diminish creditor recoveries.

50.     In connection with the Debtors' determination that their best financing was through the Post-Petition Financing Agreement, the Debtors negotiated, at arms'-length and in good faith, the Post-Petition Financing Agreement.

51.     Without the liquidity provided by the Post-Petition Loans, the Debtors would be unable to pay vendors, landlords, and other constituencies that are essential to the orderly operation of the business and the retention of the value of their assets through either a sale or an orderly liquidation of such assets.

52.     Access to substantial credit is necessary to meet the substantial day-to-day costs associated with winding down the Debtors' affairs, distributing goods to customers, and marshalling and selling their assets.  Access to sufficient cash is therefore critical to the Debtors. In the absence of immediate access to cash and credit, the Debtors' suppliers will refuse to sell critical supplies and services to the Debtors, and the Debtors will be unable to operate their business or maximize recoveries on their assets.

53.     For these reasons, access to credit under the Post-Petition Financing Agreement and the financial accommodations as provided thereby are critical to promote: (a) an orderly sale or liquidation of the Debtors' business assets as a going concern; (b) the maintenance of the value of the Debtors' assets; and (c) the Debtors' ability to effectively maximize the value of their assets.

54.     The Debtors submit that the proposed terms of the Post-Petition Financing Agreement are fair, reasonable and adequate in that these terms neither tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor prevent motions by parties in interest from being decided on their merits.

55.     The Debtors believe the Interim Order represents a fair and reasonable interim arrangement for debtor-in-possession financing pending the Final Hearing.  The Interim Order does not make any findings with regard to the amount of the Pre-Petition Indebtedness owed by the Debtors to the Pre-Petition Lender or the validity, extent and priority of the Pre-Petition Lender's liens and security interests that bind interested parties other than the Debtors. Accordingly, the rights of all non-Debtor parties in respect of such matters are fully reserved. Thus, unsecured creditors will not be prejudiced by entry of the Interim Order.

56.     While the Interim Order binds the Debtors' with respect to the validity, perfection or amount of the Pre-Petition Lender's prepetition lien and debt and waives Debtors' claims

15

related thereto, the Debtors believe these provisions are justified because they do not bind other interested parties and other interested parties are given the requisite investigation time to analyze and, if necessary, bring an action challenging the validity, priority, and extent of the liens.

57.     The Debtors and the Post-Petition Lender, who also was the Pre-Petition Lender, have negotiated a Budget expected to be sufficient to ensure that all, or virtually all, administrative expenses through the closing of the sale of substantially all of the Debtors' assets will be satisfied via the Post-Petition Financing Agreement or otherwise by the Post-Petition Lender.  The Post-Petition Financing Agreement also provides for a burial budget if unexpected events transpire that lead to a default and termination under that Agreement.  Given the Pre-Petition Lender and the Post-Petition Lender's willingness to "pay to play" in these Chapter 11 Cases, the Debtors' believe their waiving of section 506(c) rights is justified.

58.     While the Interim Order provides that the liens securing the Post-Petition Loans and the Pre-Petition Lender's adequate-protection claims are senior to existing liens that were junior to the Pre-Petition Lender's liens prior to the Petition Date, the Debtors believe that the claims of the Pre-Petition Lender are undersecured, and thus any claims secured by junior liens on the Pre-Petition Collateral are effectively unsecured.  Consequently, the Debtors believe the lien rights related to such claims are not entitled to adequate protection.

59.     The Interim Order states that, in providing the Post-Petition Loans, the Post-Petition Lender shall not be deemed to be a party in control, responsible person or owner/operator.

60.     The Interim Order provides that upon the occurrence of a Termination Event, (a) the Debtors may no longer borrow funds under the Post-Petition Financing Agreement, use Cash Collateral or use any proceeds of the Post-Petition Loans already received, (b) the Post-Petition Lender is authorized to accelerate the Post-Petition Loan and charge Default Interest,

and (c) the Post-Petition Lender is authorized to hold any balances in any accounts of the Debtors.  However, upon a Termination Event, the Post-Petition Financing Agreement provides for the Carve-Out and contemplates that the Debtors may file a motion seeking the authority to use Cash Collateral.

61.     The Interim Order provides that, upon a Termination Event, the Post-Petition Lender shall be entitled to seek an emergency hearing upon five (5) business days' notice, requesting relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code to permit the Post-Petition Lender to realize upon or to exercise any right or remedy with respect to the Post-Petition Collateral, however the Post-Petition Lender is required to give the Debtors five (5) business days' notice, which will provide the Debtors with sufficient time to challenge any such action if consistent with its fiduciary duties.

62.     Attached to the Debtors' motion as Exhibit C is a Budget.  The Budget reflects on a line-item basis, the Debtors' anticipated cumulative cash receipts and expenditures by week and all necessary and required cumulative expenses which the Debtors expect to incur during each week of the Budget.

63.     Pending the Final Hearing, the Debtors require immediate financing for, among other things, maintenance of their facilities and other working capital needs. It is essential that the Debtors immediately stabilize their operations and continue paying for ordinary, post-petition operating expenses, as well as the pre-petition expenses approved in the "first day" orders, to minimize the damage occasioned by its cash flow problems and maximize the potential value of their assets.

64.     Absent immediate use of financing, the Debtors will be unable to pay operating expenses and move toward the sale of their business assets as a going concern pending the Final Hearing.  Consequently, if interim relief is not obtained, the value of the Debtors' assets will be

immediately and irreparably jeopardized, to the detriment of the estates, their creditors and other parties in interest.

65.     Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request to obtain emergency interim credit under the Post-Petition Financing Agreement and the terms of the Interim Order.

**(2)     Debtors' Motion for Entry of An Order Authorizing the Debtors to Pay Prepetition Sales, Use and Other Tax Obligations**

66.     The Debtors, in the ordinary course of business, are required to collect certain Taxes in connection with the operation of their business and must remit these Taxes and to the Taxing Authorities of the jurisdictions in which the Debtors conduct business.  Prior to the Petition Date, the Debtors incurred obligations to federal, state, and local governments and other governmental agencies.  As of the Petition Date, certain Taxes were outstanding and/or had accrued but were not yet due.  For example, Taxes attributable to the prepetition portion of the 2014 tax year will not be due until the applicable monthly, quarterly, or annual payment dates. The Debtors' estimate that, if granted, they may pay up to approximately $2,874.00 in Taxes pursuant to the relief requested in this motion.

67.     The process by which the Debtors remit such Taxes varies depending on the nature of the tax at issue and the Taxing Authority to which the relevant tax is paid.  For instance, the Taxes accrue daily in the ordinary course of the Debtors' business and are calculated based upon statutorily mandated percentages of the Debtors' sales.  In some cases, Taxes are paid in arrears, once they are collected by the Debtors.  Many jurisdictions, however, require the Debtors to remit estimated Taxes on a periodic basis.  The Debtors then generally file a sales and use tax return with the relevant taxing authority reporting the actual sales and use tax due and paying any further amounts owed for the period.

68.     As an initial matter, the Debtors submit that most, if not all, of the Taxes constitute either so-called "trust fund" taxes which are required to be collected from third parties and held in trust for payment to the Taxing Authorities or are tax claims entitled to priority treatment pursuant to sections 502(b) or 507(a) of the Bankruptcy Code.

69.     Payment of the Taxes when they become due will, however, relieve the Debtors and their estates from significant administrative burdens.

70.     Payment of the Taxes to the Taxing Authorities in full and on time is undeniably justified under the circumstances of these cases.  If the Debtors fail to timely pay the Taxes, or withhold payment of the Taxes as a precaution, the Taxing Authorities would likely take precipitous actions, such as seeking to impose liens on the Debtors' assets.  The Debtors may also experience a marked increase in audits from the Taxing Authorities.  Such actions would unnecessarily divert the Debtors' attention from the bankruptcy process and waste valuable estate resources.  An improper lien or the failure to pay certain taxes might also affect the Debtors' good standing in certain states, which may hinder the Debtors' ability to engage in certain transactions.

71.     Personal liability actions against the Debtors' officers or directors for the payment of "trust fund" taxes would be extremely distracting for the Debtors' directors and officers, whose full time focus must be to formulate and implement a value maximizing plan for the Debtors.  The Debtors submit that it is in their best interests, as well as the best interests of their creditors, to eliminate the possibility of such time consuming and potentially damaging distractions.  Prompt and regular payment of the Taxes would avoid any such unwarranted governmental action and the associated administrative burden on the Debtors' estates.

72.     As a result, payment of the Taxes to the Taxing Authorities in full and on time is justified under the circumstances of these cases.

> **(3)** **Debtors' Motion for Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code (I) Authorizing Debtors to Honor Prepetition Insurance Policies and Renew Such Policies in the Ordinary Course of Business and (II) Granted Related Relief**

73.     In the ordinary course of the Debtors' businesses, the Debtors retain and maintain the Insurance Policies providing coverage for, *inter alia*, auto, crime, inland marine, property and general liability, excess liability and workers' compensation.  A detailed listing of the Insurance Policies that are currently held by the Debtors is attached to the motion as <u>Exhibit A</u>.

74.     The Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in many cases, such coverages are required by various regulations, laws, and contracts that govern the Debtors' commercial activity.

75.     The annual premiums for the Insurance Policies, which the Debtors maintain through a handful of different insurance carriers, total approximately $1,313,848.

76.     It is the Debtors' business practice to pay Insurance Premiums in a timely fashion, and they do not believe that they have any unpaid Insurance Premiums as of the Petition Date.  However, given the timing of the bankruptcy filing, it is possible that some of the Insurance Premiums may not have been paid as of the Petition Date.  Failure to make these ongoing premium payments when due will cause harm to the Debtors' estates in several ways.  First, if the Debtors fail to make their payments, the insurers may seek to terminate the Insurance Policies to recoup their losses.  The Debtors would then be required to obtain replacement insurance on an expedited basis.  This replacement insurance likely would require not only that the Debtors pay a lump-sum premium for the insurance policy in advance, but would involve a higher overall cost than the premium the Debtors currently pay.

77.     Even if the insurers were not permitted to terminate the Insurance Policies, any interruption of payment would have a severe and adverse impact on the Debtors' ability, in the ordinary course of their businesses, to renew any Insurance Policies that expire postpetition.

78.     In light of the importance of maintaining the Insurance Policies with respect to their business activities, the Debtors need to honor their obligations under the existing Insurance Policies.  As described above, any other alternative would likely require considerable additional cash expenditures.

**(4)     Debtors' Motion for Interim and Final Orders (i) Prohibiting Utilities From Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors, (ii) Determining That the Utilities Are Adequately Assured of Future Payment; (iii) Establishing Procedures for Determining Requests for Additional Assurance; and (iv) Permitting Utility Companies to Opt Out of the Procedures Established Herein**

79.     The Debtors currently use electric, natural gas, heat, water, telecommunications, and other services of the same general type or nature provided by approximately 54 Utility Companies (including agents, divisions, affiliates and subsidiaries).  A list of the Debtors' Utility Companies is set forth on Exhibit 1 to their motion.  It is possible that, despite the Debtors' efforts, certain Utility Companies have not yet been identified by the Debtors or included on the Utility Service List.  The Debtors estimate that their average monthly obligations to the Utility Companies on account of services rendered total approximately $69,505.41.

80.     Because the Utility Companies provide services essential to the Debtors' operations, any interruption in utility services could prove damaging.  The Debtors could not maintain and operate their business in the absence of continuous utility service.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors would be forced to cease the operation of the affected location, resulting in a substantial loss of revenue. The temporary or permanent discontinuation of utility services at any of the Debtors' facilities therefore could irreparably harm the Debtors' estates.

81.     The Debtors intend to pay in a timely manner their post-petition obligations to the Utility Companies.  Furthermore, the Debtors have previously provided security deposits to 1 of

the Utility Companies in an aggregate amount of approximately $18,030, which has earned interest of $9,540.09, so as to total $27,570.49.

82.     The Debtors further submit that the Proposed Adequate Assurance constitutes sufficient adequate assurance of future payment to the Utility Companies to satisfy the requirements of section 366 of the Bankruptcy Code.

## C.     Sale Related Motion

**Emergency Motion For Entry Of An Order (A) Approving Bid Procedures And Sale Procedures; (B) Approving Form And Manner Of Notices; (C) Approving Form Of Asset Purchase Agreement, Including Break-Up Fee And Expense Reimbursement; (D) Scheduling Dates To Conduct Auction And Hearing To Consider Final Approval Of Sale And Related Matters; (E) Approving Sale Of Substantially All Of Certain Debtors' Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests; (E) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases And (F) Granting Related Relief**

83.     As set forth in detail above, the Debtors, with the assistance of their advisors, actively marketed the company since late July 2014, focusing on a sale of substantially all of their assets as a going concern. Even before the Petition Date, the Debtors conducted a well-orchestrated sale process targeting the company's universe of potential strategic and financial buyers in an effort to maximize the value of the Debtors' assets.

84.     The Debtors, led by Michael Compton, have aggressively pursued a potential sale of the Debtors' assets. The Debtors undertook exhaustive efforts to solicit interest in the Debtors from third parties with the potential to acquire all or a substantial portion of the assets.

85.     As a result of their efforts, the Debtors have identified a Proposed Purchaser of the Purchased Assets and executed the Agreement with the Proposed Purchaser for the purchase of the Purchased Assets for the aggregate price of approximately $23 million, plus adjustments for the Debtors' inventory and the assumption of certain liabilities, including certain cure costs and liabilities arising after the closing of the sale with respect to the Purchased Assets or the operation of the Business following the closing.

22

86. The Debtors have determined that a prompt sale of the Purchased Assets is the best way to maximize the value of the Purchased Assets for their respective estates and creditors.

87. The Debtors have sound business justifications for selling the Purchased Assets at this time. While the Debtors currently have limited access to capital, they are endowed with a strong customer base, well-respected brands, and solid operations. Accordingly, the Debtors have determined that the best option for maximizing the value of their estates for the benefit of their creditors is through the sale of all or a portion of the Purchased Assets.

88. The sale of any of the Purchased Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Purchased Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

89. To provide the Proposed Purchaser with an incentive and compensation for entering into the Asset Purchase Agreement and for the extensive fees and costs it will incur by serving as the stalking horse purchaser, the Debtors have agreed to a Break-Up Fee and Expense Reimbursement. The Debtors believe that offering the Break-Up Fee and Expense Reimbursement to the Purchaser will benefit the Debtors' estates by establishing a floor and promoting more competitive bidding. Without such a fee, bidding on the Purchased Assets would likely be reduced. The availability of the bid protections is necessary in order to provide the Proposed Purchaser with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the Purchased Assets and for the risk that arises from participating in the sale and subsequent bidding process as the stalking horse bidder.

90. The Debtors believe that the Bidding Procedures are appropriate to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and

creditors.  The Bidding Procedures proposed are designed to maximize the value received for the Purchased Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.  The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest and best offer for portions of the Purchased Assets or the Purchased Assets as a whole as determined by the Debtors.

I believe that the commencement of this Chapter 11 Cases is in the best interests of the Debtors' stakeholders and other parties-in-interest.  As they did during the prepetition period, the Debtors, with the assistance of their professionals, will continue to maintain and enhance the going concern value of the companies while pursuing a reorganization strategy.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: October 23, 2014

_____/s/ Steven A. Nerger_____

Steven A. Nerger
Chief Restructuring Officer of the Debtors

101615684v3