## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COUNTRY STONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 14-81854 |
| | ) | (Request for Joint Administration |
| | ) | Pending) |
| Debtors. | ) | |
| | ) | Hon. Thomas L. Perkins |

**MOTION FOR ENTRY OF AN ORDER (A) APPROVING BID PROCEDURES AND SALE PROCEDURES; (B) APPROVING FORM AND MANNER OF NOTICES; (C) APPROVING FORM OF ASSET PURCHASE AGREEMENT, INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (D) SCHEDULING DATES TO CONDUCT AUCTION AND HEARING TO CONSIDER FINAL APPROVAL OF SALE AND RELATED MATTERS; (E) APPROVING SALE OF SUBSTANTIALLY ALL OF CERTAIN DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (G) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (the "Debtors") submit this motion (this "Motion") for entry of orders (A) approving bid procedures and sale procedures; (B) approving form and manner of notices; (C) approving form of asset purchase agreement, including a break-up fee and expense reimbursement; (D) scheduling dates to conduct an auction and hearing to consider final approval of sale and related matters; (E) approving sale of substantially all of certain debtors' assets free and clear of all liens, claims, encumbrances and interests; (F) authorizing the assumption and assignment of certain executory contracts and

---

[1] The Debtors and the last four digits of the Debtors' United States Tax Identification Number following in parentheses: Country Stone Holdings, Inc. (7470), Country Stone & Soil, Inc. (0842), Country Stone and Soil of Minnesota (8538), Country Stone and Soil of Wisconsin (4446), Country Stone, Inc. (8953), Fort Wayne Landscape Supply, Inc. (9116), Green Thumb of Indiana, LLC (8377), Infinity Fertilizers, Inc. (8035), Infinity Lawn and Garden, Inc. (5005), Infinity Seed, Inc. (6096), Millburn Peat Company (7370), Quad City Express, Inc. (2687), R & D Concrete of Indiana, Inc. (5210), R & D Concrete of Wisconsin, Inc. (2237), R & D Concrete Products, Inc. (7199), Rock Island Contractors, Inc. (0041) and Wilhelm Sand & Gravel, Inc. (5212).

unexpired leases and (G) granting related relief.  In support of this Motion, the Debtors submit

the Declaration of Steven A. Nerger in Support of Chapter 11 Petitions and First Day Motions

and Applications, sworn to on the date hereof (the "Declaration in Support of First Day Relief"),

and respectfully represent as follows:

BACKGROUND

1.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code"), together with various motions and applications seeking certain typical

"first day" orders.

2.      The Debtors continue to operate their business and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner, and no

official committee(s) has been appointed in these cases.

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue of the Debtors' chapter 11 cases and this motion is proper in this district pursuant

to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

5.      The statutory bases for the relief requested herein are sections 105(a), 363, 365 of

the Bankruptcy Code and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

2002, 6004, and 6006.

**A.      Background and Current Business Operations.**

6.      The Debtors are in the business of manufacturing, processing, and packaging

lawn and garden products such as mulch, soil, fertilizer, plant food, organics, concrete and

decorative stone for sale both to "big box" retailers, as well as to smaller, independent garden

supply stores (collectively, the "Business").  The Debtors corporate headquarters are located in

2

Rock Island, Illinois and Milan, Illinois.  The Debtors operate 17 plants throughout the United

States, including in Illinois, Iowa, Indiana, Minnesota, Wisconsin, Missouri, and California.

7.      Pre-petition, First Midwest Bank (the "Pre-Petition Lender") made certain loans

and financial accommodations (collectively, the "Pre-Petition Loans") to the Debtors to, *inter*

*alia*, fund the Debtors' business operations.  As of the Petition Date, the Debtors owed the Pre-

Petition Lender approximately $38,200,345.87 (the "Pre-Petition Indebtedness").

8.      Ronald D. Bjustrom ("Bjustrom") and Country Stone & Soil of Indiana, Inc.

guaranteed the Debtors repayment of the Pre-Petition Indebtedness.

9.      The Pre-Petition Indebtedness is secured by, among other things, liens on all of

the Debtors' personal property and its real property located at 2397 County Road 27, Waterloo,

Indiana.  The liens granted to the Pre-Petition Lender were perfected by filings with the

appropriate state and local filing offices.

10.      In addition to the Pre-Petition Loans, Debtor Country Stone & Soil of Minnesota,

Inc. is a party to a loan agreement pursuant to which it received loans and other financial

accommodations from Triumph Community Bank (f/k/a The National Bank).  That loan is

subject to an Intercreditor agreement by and among the Pre-Petition Lender, Triumph

Community Bank, and Country Stone & Soil of Minnesota, Inc.

11.      Following the Debtors' default on its Pre-Petition Loan obligations, on or about

August 1, 2014, the Debtors, the Pre-Petition Lender, Bjustrom and Country Stone & Soil of

Indiana, Inc. entered into that certain Second Amendment and Forbearance Agreement with

respect to the Pre-Petition Loans.  The Pre-Petition Lender and the Debtors agreed, through the

Forbearance Agreement, that the Debtors would hire certain professionals from Silverman

Consulting.  Upon being retained, Silverman Consulting's duties included leading a process to

sell the Debtors' assets, interfacing with prospective purchasers, marketing the assets, and negotiating sale documents and terms.

**B.      The Debtors' Marketing and Sales Efforts.**

12.      The Debtors, led by Silverman Consulting, aggressively pursued a potential sale of the Debtors' assets. The Debtors undertook exhaustive efforts to solicit interest in the Debtors from third parties with the potential to acquire all or a substantial portion of the assets.

13.      At the outset of this process, the Debtors determined, in consultation with their advisors and the Pre-Petition Lender, to focus their sale efforts on locating a stalking horse bidder for substantially all or portions of their assets (the "Purchased Assets").   The Debtors believe the Purchased Assets can be sold as a whole or in lots.

14.      During the marketing process, the Debtors identified and contacted approximately 500 potential strategic and financial counterparties. Approximately 19 of these parties executed confidentiality agreements and received a confidential information memorandum providing extensive information relating to the Debtors' businesses, financial performance and projections, customers, programs, operations, facilities, management, and employee matters. Approximately 4 companies received a detailed management presentation, either in-person or by phone, and were given the opportunity to speak extensively with the Debtors and its advisors. Of these, 4 had submitted written indications of interest to acquire some or all of the Purchased Assets of the Debtors as a going concern.

15.      One of these parties, Quikrete Holdings, Inc. (the "Proposed Purchaser"), submitted a preliminary proposal.  The Proposed Purchaser is a closely-held corporation that is a major player in the concrete, decorative stone, lawn, and garden market.

16.      The Proposed Purchaser's offer has been the basis for extensive discussions and negotiations with the Debtors, ongoing diligence and discussions with management, and visits to

the Debtors' facilities.  As a result, on the Debtors and the Proposed Purchaser entered into that certain Asset Purchase Agreement dated as of October 23, 2014 (the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit A, for the purchase of the all right, title and interest in, to or under all of the properties and assets of the Debtors (other than the Excluded Assets as defined in the Asset Purchase Agreement) of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business (as more fully defined in the Asset Purchase Agreement as the Purchased Assets) for the aggregate price of approximately $20 million, plus adjustments for the Debtors' inventory as described more fully below and the assumption of certain liabilities, including certain cure costs and liabilities arising after the closing of the sale and exclusively with respect to the Purchased Assets or the operation of the Business following the closing.

17.     At this juncture, the Proposed Purchaser's bid is the highest and best that the Debtors have received.  Now that the Debtors have concluded negotiations with the Proposed Purchaser as the stalking horse bidder (subject to approval by this Court), the Debtors have begun to (and plan to continue to) focus their attention, time, and energy on bidders with continuing interest in the Debtors' assets in order to pursue the possibility that value may be maximized at an auction.

18.     The Debtors expect that the purchase price for the Purchased Assets will be insufficient to satisfy the Pre-Petition Indebtedness.  As a result, the Debtors anticipate that they will remit all such proceeds directly to the Pre-Petition Lender and the Other Secured Creditors in partial satisfaction of the secured claims against the Debtors.

19.    Because of various factors, including the requirements for the Debtors' maintenance of its debtor-in-possession financing, and the Proposed Purchaser's desire not to unnecessarily tie up capital or risk of losing other business opportunities, the Debtors have proposed to move forward with the sale process on an expedited basis and within a specified time frame.  Consequently, the Debtors have determined that it is in the best interest of their estates, creditors, and other parties in interest to move forward with the sale process set forth herein.

20.    Accordingly, the Debtors have proposed the following timeline for the sale of the Purchased Assets:[2]

- November 10, 2014 – Bidding Procedures Hearing

- December 15, 2014 – Submission Deadline for Qualified Bids (as defined below)

- December 17, 2014 – Auction (as defined below)

- December 18, 2014 – Proposed Sale Hearing

**C.    The Asset Purchase Agreement.**

21.    A summary of the principal terms of the Asset Purchase Agreement is as follows:[3]

- "Purchase Price".  Is an amount equal to Twenty Million Dollars ($20,000,000), *plus* (i) an amount equal to an adjusted value of inventory *minus* (ii) the amount of the Cure Costs existing as of the Closing associated with those contracts and leases to be assumed and assigned by the Proposed Purchaser.

---

[2] The Debtors, in the exercise of their business judgment, reserve their right to change these sale-related dates in order to achieve the maximum value for the Purchased Assets, while cognizant of the deadlines set forth in the Asset Purchase Agreement.

[3] The following summary is qualified in its entirety by reference to the provisions of the Asset Purchase Agreement.  In the event of any inconsistencies between the provisions of the Asset Purchase Agreement and the terms herein, the terms of the Asset Purchase Agreement shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Asset Purchase Agreement.

- <u>Adjustments to Consideration</u>.  The following items shall be prorated between the Debtors and the Proposed Purchaser as of the Closing Date: (i) applicable property taxes, (ii) utilities, (iii) lease payments under any Leases assumed by the Proposed Purchaser and (iv) any assessments with respect to Owned Real Property.  The Debtors shall be responsible for amounts relating to the period prior to the date of Closing and the Proposed Purchaser shall be responsible for amounts relating to the date of Closing and thereafter.

- <u>Payment of Cure Costs</u>.  The Proposed Purchaser agrees to assume certain liabilities of the Debtors, including, among other things, (i) amounts required to pay all Cure Costs existing as of the Closing associated with those Contracts and Leases which are assumed by Purchaser at Closing and (ii) the Liabilities arising after the Closing Date exclusively with respect to the Purchased Assets or the operation of the Business following the Closing.

- <u>Purchased Assets</u>.  Substantially all of the assets of the Debtors, except the Excluded Assets, as defined and set forth in the Asset Purchase Agreement.

- <u>Operations Pending Closing</u>.  Until the closing, the Debtors are subject required to carry on their business in the ordinary course, taking into account their status as debtors-in-possession.

- <u>Sale of Purchased Assets in More than One Lot</u>.  The Proposed Purchaser shall be entitled to participate as a Qualified Bidder in the auction of any of the lots of the Debtors' assets.

- <u>Termination to Pursue Higher or Better Offer</u>.  If the Debtors terminate the Asset Purchase Agreement to close on a Qualified Bid submitted at the Auction from a party other than the Proposed Purchaser, the Debtors must pay the Proposed Purchaser a $400,000 Break-Up Fee and Expense Reimbursement up to $100,000.  The Proposed Purchaser shall retain the right to receive payment of the Break-up Fee and Expense Reimbursement, in respect of the Debtors' sale or attempt to sell the Purchased Assets in more than one lot and consequent termination of the Asset Purchase Agreement.  If, in such event, the Proposed Purchaser is the Successful Bidder and closes the purchase of all of the Purchased Assets, the Break-up Fee and Expense Reimbursement shall not be payable.  If the Proposed Purchaser is the Successful Bidder and purchases only one of the two available lots, the Break-up Fee and Expense Reimbursement shall be prorated based on the total purchase price of the all Purchased Assets and the purchase price of the assets purchased by the Proposed Purchaser.

### RELIEF REQUESTED

22.     The Debtors have determined that a prompt sale of the Purchased Assets is the best way to maximize the value of the Purchased Assets for their respective estates and creditors.

23.     Accordingly, by this Motion, the Debtors seek approval for the sale of the Purchased Assets to the Proposed Purchaser, subject to additional competitive bidding pursuant to the proposed Bidding Procedures (as defined below).  To effect the Sale, the Debtors seek two types of relief.  The Debtors will seek this Court's entry of an order, substantially in the form of the Bidding Procedures Order attached hereto as <u>Exhibit B</u>, approving the bidding procedures and certain bid protections to be provided to the Proposed Purchaser pursuant to the Asset Purchase Agreement, attached thereto as <u>Exhibit 1</u> (the "<u>Bidding Procedures</u>"); the notice of the sale and related procedures, attached thereto as <u>Exhibit 2</u> (the "<u>Sale Notice</u>"), and the notice of Assumption and Cure Amount with Respect to Executory Contracts or Unexpired Leases Potentially to be Assumed and Assigned in Connection with the Sale of the Debtors' Assets, attached thereto as <u>Exhibit 3</u> (the "<u>Cure Notice</u>").  Second, subject to the terms of the Bidding Procedures Order, the Debtors will seek this Court's entry of an order substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>Sale Approval Order</u>") authorizing and approving the transactions contemplated by the Asset Purchase Agreement and the sale of the Purchased Assets to the Proposed Purchaser or the Successful Bidder (as defined below), as the case may be, including, without limitation, the assumption and assignment of the Assumed Contracts.  The Debtors intend to file a notice to reject their pre-petition contracts and unexpired leases not assumed by the Successful Bidder (the "<u>Rejected Contacts</u>") following the closing of the sale.

### BASIS FOR RELIEF

24.     In furtherance of the Debtors' duty to maximize the value of their estates, the Debtors have filed this Motion seeking approval of a sale process, including the Bidding Procedures.

25.     As set forth above, the Debtors have taken great strides to improve their Business and make themselves attractive for sale.  The Debtors have run a full and exhaustive marketing

process prepetition and believe that a sale to the Proposed Purchaser or the Successful Bidder (as defined below), and the approval of the Bidding Procedures, are in the best interests of the estates.

## A.    The Bidding Procedures.[4]

26.    In order to maximize the value of the Purchased Assets for the benefit of the Debtors' estates and their respective creditors, the Debtors seek to implement a competitive bidding process that is designed to generate maximum recovery, as described more fully in the Bidding Procedures.

27.    The following summarizes the Bidding Procedures:[5]

- **Qualified Bids**.  To be eligible to participate in the Auction, each Bid and Bidder, must be determined by the Debtors and Post-Petition Lender to satisfy each of the following conditions:

    a)    Each Bid must be accompanied by a deposit in the amount equal to 10% of the Bid to an interest-bearing escrow account.

    b)    The Bid must be on terms that are substantially the same or better than the terms of the Asset Purchase Agreement.  A Bid must identify which assets the Bidder intends to purchase and include executed transaction documents.

    c)    The Bid must include written evidence that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Competing Transaction.

    d)    A Bid may not conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

    e)    A Bid must be irrevocable through the Auction.

    f)    The Bid must be received by the required parties no later than  December 15, 2014, at 5:00 p.m. (Central Time).

---

[4] Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures.

[5] The following description of the Bidding Procedures is a summary only. To the extent that this summary differs in any way from terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

g)      A Bid for all of the Purchased Assets (a) must propose a purchase price equal to or greater than the aggregate of the sum of (i) the value of the Bid set forth in the Asset Purchase Agreement executed by the Proposed Purchaser; (ii) the dollar value of the Break-up Fee and Expense Reimbursement in cash, and (iii) $200,000 (the initial overbid amount), in cash and (b) must obligate the Bidder to pay all amounts which the Purchaser under the Agreement has agreed to pay, including all Assumed Liabilities.

A Bid for only the Block Assets must contain proposed consideration for the Block Assets of at least $10,000,000.

A Bid for only the Non-Block Assets must contain proposed consideration for the Non-Block Assets of at least $5,000,000.

- **Auction**.  If one or more Qualified Bids (other than the Asset Purchase Agreement submitted by the Proposed Purchaser) are received by the Bid Deadline, the Debtors will conduct an Auction to determine the highest and best Qualified Bid.  If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtors may determine not to conduct the Auction.  Only Qualified Bidders may participate in the Auction.

   (a)      At the start of the Auction, the Debtors shall announce which Qualified Bid(s) is/are deemed to be the highest and best (each Qualified Bid an "Auction Baseline Bid").

   (b)      The Break-up Fee and Expense Reimbursement shall be taken into account in connection with each round of bidding and in each phase of the Auction.

   (c)      If an Auction Baseline Bid has been received for each of (i) the Purchased Assets, (ii) the Block Assets and (iii) the Non-Block Assets, the Debtors shall first conduct the auction of the Purchased Assets until bidding closes.  The Debtors shall then conduct the auction of the Block Assets and Non-Block Assets, respectively, until bidding closes on each lot.  If the aggregate purchase price for the Block Assets and Non-Block Assets is less than the purchase price for the Purchased Assets, the highest Qualified Bidder for the Purchased Assets shall be deemed the Successful Bidder.  If the aggregate purchase price for the Block Assets and Non-Block Assets is greater than the purchase price for the Purchased Assets, the Debtors shall open bidding for the Purchased Assets to determine if a Qualified Bidder would bid an amount in excess of such aggregate purchase price.

   (d)      The Proposed Purchaser shall have the last opportunity to bid after the receipt of any Overbid and before the next round of bidding commences.

   (e)      An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of an Auction Baseline Bid.  Any Overbid after the Auction Baseline Bid shall be made in increments valued at not less than $100,000.

Additional consideration in excess of the amount set forth in an Auction Baseline Bid may include cash and/or noncash consideration, and, in the case of a Bid by the Proposed Purchaser, a credit bid of the Break-up Fee and Expense Reimbursement.

(f)    If an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction will be designated as the backup bidder. The Backup Bidder shall be required to keep its Backup Bid open and irrevocable until the earlier of 12:00 p.m. (Central Time) on the date that is fourteen (14) days after the date of the Auction or the closing of the transaction with the Successful Bidder.

**B.      Proposed Purchaser's Agreement And Bid Protections.**

28.    In order to provide an incentive and to compensate the Proposed Purchaser for entering into the Asset Purchase Agreement and the extensive fees and costs incurred as serving as the stalking horse purchaser, the Debtors have agreed to the Break-Up Fee and the Expense Reimbursement, which shall be used to reimburse the Proposed Purchaser for expenses incurred in connection with the Proposed Purchaser's attempted purchase of the Purchased Assets and for its willingness to serve as stalking horse bidder.

29.    By this Motion, the Debtors are seeking approval to provide certain bid protections to the Proposed Purchaser in accordance with the Asset Purchase Agreement. The Debtors believe that offering the Break-Up Fee and the Expense Reimbursement to the Proposed Purchaser (the "Bid Protections") will benefit the Debtors' estates by establishing a floor and promoting more competitive bidding. Without such a fee, bidding on the Purchased Assets would likely be reduced. The availability of the Bid Protections is necessary in order to provide the Proposed Purchaser with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the Purchased Assets and the risk that arises from participating in the sale and subsequent bidding process as the stalking horse bidder.

**C.    Notice of the Bidding Procedures and the Sale.**

30.    The Debtors propose the following procedures for providing notice of the Bidding Procedures and the Sale.

31.    On or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice to be sent by first-class mail postage prepaid, to the following:  (a) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Purchased Assets; (b) the Office of the United States Trustee for the Central District of Illinois; (c) counsel to the Proposed Purchaser; (d) counsel to the pre-petition and post-petition secured lenders; (e) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (f) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any known interest in the relief requested by the Motion; (g) all counterparties to any executory contract or unexpired lease of the Debtors; (h) all other known creditors and interest holders of Debtors; and (i) all potential bidders previously identified or otherwise known to the Debtors.

**D.    Cure Notice Procedures.**

32.    The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume such contracts or leases.

33.    On or before three (3) business days after the entry of the Bidding Procedures Order, the Debtors will serve by first class mail or hand delivery the Cure Notice on all non-Debtor parties to certain contracts and unexpired leases to be listed in the Cure Notice (the

"Scheduled Contracts"). The Cure Notice shall identify the Scheduled Contracts and provide the cure amounts that the Debtors believe must be paid to cure all prepetition defaults under the Scheduled Contracts (each a "Cure Amount" and, collectively, the "Cure Amounts").

34.     Unless, on or before 5:00 p.m. (Central Time) on December 15, 2014, (the "Sale Objection Deadline"), the non-Debtor party to a Scheduled Contract files an objection to its scheduled Cure Amount, the assumption and assignment to the Proposed Purchaser of the Scheduled Contracts or the ability of the Proposed Purchaser to provide adequate assurance of future performance and serves a copy of the applicable objection, so as to be received the same day as the objection is filed, to (i) Country Stone Holdings, Inc., c/o Silverman Consulting, 5750 Old Orchard Road, Suite 520, Skokie, Illinois 60077 (Attn: Steven A. Nerger, Chief Restructuring Officer), snerger@silvermanconsulting.net, (ii) counsel to the Debtors, Katten Muchin Rosenman LLP, 525 W. Monroe Street, Suite 1900, Chicago, Illinois 60661 (Attn: John P. Sieger), john.sieger@kattenlaw.com, (iii) counsel to the Debtors' prepetition secured lender and proposed post-petition secured lender, First Midwest Bank, Dykema Gossett PLLC, 10 S. Wacker Drive, Suite 2300, Chicago, Illinois, 60606 (Attn: Gary P. Segal and Richard M. Bendix), gsegal@dykema.com and rbendix@dykema.com, (iv) counsel for the official committee of unsecured creditors, if any, (v) counsel for the Proposed Purchaser, Smith, Gambrell & Russell, LLP, Suite 3100, Promenade, 1230 Peachtree Street, N.E., Atlanta, Georgia 30309 (Attn: Howard E. Turner and Brian Hall); hturner@sgrlaw.com, and (vi) the Office of the United States Trustee, United States Trustee Nancy J. Gargula, 401 Main Street, Peoria, Illinois, 61602, (Attn: Sabrina M. Petesch), Sabrina.m.petesch@usdoj.gov, such non-Debtor party should be forever barred and estopped from objecting (x) to the Cure Amount and from asserting that any additional amounts are due or defaults exist, (y) that any conditions to assumption and

assignment must be satisfied under such Scheduled Contract before it can be assumed and assigned to the Proposed Purchaser or that any required consent to assignment has not been given or (z) that the Proposed Purchaser has not provided adequate assurance of future performance.

35.     If the bid of the Proposed Purchaser is not the Qualified Bid that the Debtors determine in their reasonable business judgment, after consultation with their financial and legal advisors, and in consultation with the Post-Petition Lender, to be the highest and best Qualified Bid at the Auction, the non-Debtor parties to the Scheduled Contracts shall have until the Sale Hearing to object to the assumption and assignment of such Scheduled Contract solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code; provided, however, that if the Proposed Purchaser is the Successful Bidder, all Adequate Assurance Objections must be filed by the Sale Objection Deadline; provided, further, however, that all objections to the assumption and assignment of Scheduled Contracts that do not relate to the issue of whether the Successful Bidder can provide adequate assurance of future performance must be filed by the Sale Objection Deadline.

36.     In the event of a dispute regarding:  (a) any Cure Amount with respect to any Scheduled Contract; (b) the ability of the Successful Bidder (including the Proposed Purchaser) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under such Scheduled Contract; or (c) any other matter pertaining to assumption, the Cure Amounts shall be paid as soon as reasonably practicable after the effective date of the assumption and assignment of the Scheduled Contract (the "Closing") and following the entry of a final order resolving the dispute and approving the assumption of

such Scheduled Contract; provided, however, that, the Debtors are authorized to settle any dispute regarding the amount of any Cure Amount or assignment to the Successful Bidder (including the Proposed Purchaser) without any further notice to or action, order or approval of this Court.

**APPLICABLE AUTHORITY**

37.    "[T]he business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F.Supp.2d 449, 462 (D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F.Supp.2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore. *See In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991).

38.    The Debtors have sound business justifications for selling the Purchased Assets at this time.  While the Debtors currently have limited access to capital, they are endowed with a strong customer base, well-respected brands, and solid operations.  Accordingly, the Debtors have determined that the best option for maximizing the value of their estates for the benefit of their creditors is through a sale of all or a portion of the Purchased Assets.

**A.    The Bidding Procedures are fair and are designed to maximize the value received for the Purchased Assets.**

39.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Debtors believe that the Bidding Procedures are appropriate

under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.  The Bidding Procedures proposed herein are designed to maximize the value received for the Purchased Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.  The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest and best offer for portions of the Purchased Assets or the Purchased Assets as a whole as determined by the Debtors.

40.    The Debtors request this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing.  Accordingly, the Debtors and all parties in interest can be assured that the consideration for the Purchased Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

**B.    The Break-up Fee and Expense Reimbursement are necessary to preserve the value of the Debtors' estates.**

41.    Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction.  The Debtors believe that having the ability to offer the Bid Protections to the Proposed Purchaser and thereby facilitating an Auction will maximize the realizable value of the Purchased Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

42.    The Third Circuit, for example, identified at least two instances in which bidding incentives may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which

bidding would have been limited." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999). Second, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id*.

43. In *O'Brien*, the Third Circuit reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

(i) the presence of self-dealing or manipulation in negotiating the breakup fee;

(ii) whether the fee harms, rather than encourages, bidding;

(iii) the reasonableness of the break-up fee relative to the purchase price;

(iv) whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

(v) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;"

(vi) the correlation of the fee to a maximization of value of the debtor's estate;

(vii) the support of the principal secured creditors and creditors committees of a break-up fee;

(viii) the benefits of the safeguards to the debtor's estate; and

(ix) the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*O'Brien*, 181 F.3d at 536.

44. The Bid Protections set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Purchased Assets and, thus, insist that competing bids be materially higher or otherwise better than the Asset Purchase Agreement, a clear benefit to the

Debtors' estates.  Moreover, the Proposed Purchaser would not agree to act as a stalking horse bidder without the Bid Protections.  Without the benefit of the Proposed Purchaser, the bids received at Auction for the Purchased Assets could be substantially lower than that offered by the Proposed Purchaser.

45.    Moreover, payment of the Bid Protections will not diminish the Debtors' estate. The Debtors do not intend to terminate the Asset Purchase Agreement, if to do so would incur an obligation to pay the Bid Protections, unless to accept an alternative bid.

**C.    Approval of the sale is warranted under Bankruptcy Code § 363(b).**

46.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).  A debtor's sale or use of assets outside the ordinary course of business should be approved by the Bankruptcy Court if the debtor can demonstrate a sound business justification for the proposed transaction.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbott's Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991).  Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

47.    The Debtors have a sound business justification for selling the Purchased Assets at this time and in the manner proposed.  Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors

have concluded that a sale of all or some of their Purchased Assets in accordance with the procedures set forth in the Bidding Procedures may be the best method to maximize recoveries to the estates.  Maximization of the Purchased Assets' value is a sound business purpose warranting authorization of any proposed sale.

48.     The sale of any of the Purchased Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Purchased Assets.  Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.[6]

49.     In addition, all creditors and parties in interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Purchased Assets and others whose interests are potentially implicated by a proposed sale.  Accordingly, consummating the sale(s) as soon as possible is in the best interests of the Debtors and their creditors and parties in interest.

**D.     The proposed sale(s) satisfy(ies) the requirements of section 363(f) for a sale free and clear of interests.**

50.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  As Bankruptcy Code section 363(f) is stated in

---

[6] The Debtors reserve all rights not to submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.

the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f).  The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

51.    The Debtors believe that at least certain of the secured lenders will consent to the sale free and clear under section 363(f)(2).  Where that may not be the case, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the secured lenders' liens will attach to the proceeds of the sale and the Debtors will establish at the Sale Hearing that the secured lenders can be compelled to accept a monetary satisfaction of their claims.

52.    The Debtors propose that any bona fide and allowed liens shall attach to the sale proceeds with the same force, validity, effect, priority and enforceability as such liens had in the Purchased Assets prior to such sale.

**E.    A Successful Bidder should be entitled to the protections of Section 363(m).**

53.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007); *Abbotts Dairies of Penn.*, 788 F.2d at 147.

54.    The Asset Purchase Agreement was negotiated at arm's-length, with both parties represented by their own counsel through extensive negotiations.  Although the Debtors engaged in discussions with other parties interested in acquiring certain of the Purchased Assets, the Debtors submit that the Proposed Purchaser's proposal as contained in the Asset Purchase Agreement represents the Proposed Purchaser's highest and best offer for the Purchased Assets.  Additionally, the Debtors will adduce facts at the sale hearing on any objection demonstrating

that any bidder who is deemed the Successful Bidder for all or any portion of the Purchased Assets has negotiated at arm's-length, with all parties represented by their own counsel.

55.     Accordingly, the Sale Approval Order will include a provision that the Successful Bidder for the Purchased Assets, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Purchased Assets and closing of the same will occur promptly.

**F.     The assumption and assignment of executory contracts and unexpired leases.**

56.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F. 2d 36, 39-40 (3d Cir. 1989).  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the

court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

57.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Doge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

58.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract…only if the trustee assumes such contract…and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee

of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

59.     The Proposed Purchaser is a closely-held corporation that is a major player in the concrete, decorative stone, lawn, and garden market.  Upon closing, the Proposed Purchaser will have financial resources that are sufficient to perform under any of the Assumed Contracts. Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of the Successful Bidder, and its willingness and ability to perform under the contracts to be assumed and assigned to it.  The Sale Hearing therefore will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts.

60.     The Debtors respectfully submit that the proposed notice procedures are appropriate and reasonably tailored to provide interested parties with adequate notice in the form of the Cure Notice of the proposed assumption and assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.  Such interested parties will then be given an opportunity to object to such notice.  If an objection is filed, such objection will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

61.     Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of any of the Purchased Assets, the Proposed Purchaser will cure any such default prior to such assumption and assignment.  Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder, its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

62.     Accordingly, the Debtors submit that implementation of the proposed notice procedures is appropriate in these cases.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in a Successful Bidder's asset purchase agreement.

**G.     Rejection of the rejected contracts.**

63.     Following the closing of the Sale, the Debtors will file a motion to reject the contracts that are not assumed and assigned to the Successful Bidder. Section 365(a) of the Bankruptcy Code allows the Debtors to reject any executory contract or unexpired lease if such rejection represents a reasonable exercise of their business judgment.  *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993); *In re Bullet Jet Charter, Inc.*, 177 B.R. 593, 601 (Bankr. N.D. Ill. 1995); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990); *Johnson v. Fairco Corp.*, 61 B.R. 317, 319-20 (N.D. Ill. 1986). Additionally, Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  If a debtor's proposed use of property pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved.  *See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).  The business judgment test requires only that the Debtors demonstrate that the rejection will benefit the estate.  *See e.g. In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).  The Debtors clearly satisfy the business judgment standard in this case. The Debtors rejection or termination of such contracts will benefit the Debtors' estates in such a manner as to maximize the potential recoveries for the Debtors' creditors.

**H.      Relief under Bankruptcy Rules 6004(h) and 6006(d) is appropriate.**

64.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of ten days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of ten days after the entry of the order, unless the court orders otherwise."   The Debtors believe that the Successful Bidder will have an interest in closing the sale of the Purchased Assets as quickly as possible after entry of the Sale Approval Order and that such timing will positively affect the ultimate value offered for the Purchased Assets.   Accordingly, the Debtors request that any Sale Approval Order be effective immediately by providing that the ten-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

<u>**NOTICE**</u>

65.      Notice of this Motion will be given to: (i) the Office of the United States Trustee for the Central District of Illinois; (ii) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Purchased Assets; (iii) counsel to the pre-petition and post-petition secured lenders; (iv) counsel to any official committee of unsecured creditors; (v) all entities known to have expressed an interest in a transaction with respect to any of the Purchased Assets as determined by Silverman, in consultation with the Debtors; (vi) counsel to the Proposed Purchaser; (vii) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any known interest in the relief requested by the Motion; (viii) all counterparties to any executory contract or unexpired lease of the Debtors;

(ix) those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these Chapter 11 Cases and (x) the creditors holding the thirty (30) largest unsecured claims on a consolidated basis.  Further, after entry of the Bidding Procedures Order, notice with respect to the Motion and the sale will be provided in accordance with the notice procedures described herein.  The Debtors submit that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

66.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order substantially in the form attached hereto (i) approving the Bidding Procedures; (ii) approving the Bid Protections; (iii) scheduling an Auction and a Sale Hearing to approve such sale or sales, and approving the form and manner of notice thereof; and (iv) granting such other and further relief as may be just and proper.  Additionally, the Debtors request that at the Sale Hearing the Court enter one or more Sale Approval Orders subject to the result of the Auction and to the Bidding Procedures (i) approving and authorizing the sale; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; (iii) authorizing the termination or rejection of the rejected contracts such that no rights are retained thereunder after such termination or rejection; and (iv) granting such other and further relief as may be just and proper.

Dated: October 23, 2014                          Respectfully submitted,


                                                 By:  /s/ Peter A. Siddiqui

                                                 John P. Sieger (ARDC No. 6240033)
                                                 Peter A. Siddiqui (ARDC No. 6278445)
                                                 Paige E. Barr (ARDC No. 6282474)
                                                 Paul T. Musser (ARDC No. 6304946)
                                                 KATTEN MUCHIN ROSENMAN LLP
                                                 525 West Monroe Street
                                                 Chicago, Illinois 60661-3693
                                                 Telephone: (312) 902-5200
                                                 Facsimile: (312) 902-1061
                                                 John.Sieger@kattenlaw.com
                                                 Peter.Siddiqui@kattenlaw.com
                                                 Paige.Barr@kattenlaw.com
                                                 Paul.Musser@kattenlaw.com

                                                 *Proposed Counsel to the Debtors and
                                                 Debtors in Possession*